Syllabus.

---

# LIEBIG MANUFACTURING COMPANY,

*vs.*

# JOHN P. WALES, M.D., WILLARD SPRINGER, M.D., JAMES WILSON, JACOB F. FRANTZ, M.D., JOHN HADLEY LEWIS AND JOSEPH JENKINS, MEMBERS OF THE BOARD OF HEALTH OF THE CITY OF WILMINGTON.

*New Castle, March T.* 1896.

The summary adjudication of the Board of Health of the City of Wilmington, declaring that the works of a company, manufacturing fertilizers, alleged to emit vile or noxious odors and gases, detrimental to the public health, will not be enjoined, when it does not appear that such odors or gases were not or could not be a nuisance, whereby the health of the inhabitants of said city was or might be injured.

The statute giving to the Board of Health of the City of Wilmington authority to abate nuisances does not involve an extension of the boundaries of the police power, or make new definitions of a public nuisance. It has simply delegated to that body a summary jurisdiction over that class of common-law nuisances which are or may be detrimental to the public health.

The judgment of a municipal body, exercised in the abatement of an alleged nuisance, is not final, and in an action for damages they must justify their action, or, in an action for a penalty, or for expenses incurred, they must establish their jurisdiction and the fact of nuisance.

An adjudication by the Board of Health of Wilmington that a business complained of is a nuisance is not conclusive, and one affected by it may test the lawfulness of its action by action at law for damages.

An injunction to restrain a Board of Health, or other municipal body, from the summary abatement of what it has adjudged to be a public nuisance detrimental to the public health, will not be granted unless it clearly appear that such body has acted wantonly are in bad faith, or has exceeded its jurisdiction.

The Court, will not, upon such application, ignore the adjudication, and try the issues of fact, as upon an original application to enjoin an alleged public nuisance. To restrain a local board from acting in such case, whenever a doubt could be raised as to the correctness of its decisions upon matters of fact, leaving the alleged nuisance unabated until trial, would defeat the object of conferring such extraordinary powers.

To allow an alleged nuisance to remain until it has been decided by a court, after deliberate trial, to be a nuisance, would defeat the purpose of such statutes.

When power is granted to a municipal body to abate alleged nuisances, private rights must be held subordinate to the public welfare, under the strictest interpretation of the maxim "*Salus populi suprema lex*"

The authority of the Legislature, to confer upon municipal bodies or officers powers for the protection of the public health and the suppression of nuisances is well settled, and has long been exercised in every state in the Union. Such powers must be summarily exercised in order to accomplish their object.

Under the authority conferred, by the charter of Wilmington (Sec. 137), upon the Board of Health, to abate nuisances detrimental to the public health, an opportunity for a hearing is not requisite and the necessity for a view of the thing or place complained of is discretionary.

In ruling as to what trades or uses of property are nuisances *per se*, or even *prima facie*, courts recognize the fact that the almost unlimited range of human ingenuity, in the present age of scientific discovery, seems to be equal to rendering almost any trade innocuous, in almost any locality.

The prohibition of noxious uses of property is the exercise of the police power, and very different from the exercise of the right of eminent domain.

INJUNCTION BILL.—The complainant, being engaged in the business of manufacturing fertilizers within the corporate limits of the City of Wilmington, was notified by the Board of Health of that city that it had declared the works of the complainant to be a nuisance, detrimental to the public health and that the same should be abated within five days. The bill was filed to enjoin the Board of Health from taking any action, against the complainant and a rule was granted to show cause why a preliminary injunction should not be

awarded, with a restraining order. The defendants filed their answer denying the equities of the bill, and affidavits were presented on both sides.

The case was heard on the motion for a preliminary injunction. The material facts are fully set forth in the opinion.

*George Gray, Lewis C. Vandegrift* and *Herbert H. Ward,* for the complainant.

The powers of the Board of Health over nuisances are limited to those specially conferred by the Charter of the City. These powers are specified in full in Section 137 of the Charter.

The general jurisdiction of the Board of Health must, therefore, be limited, (1) to the powers and authority which the Council might or could exercise relative to the object of their institution, (2) to powers and authority conferred and duties enjoined upon members of the Board of Health by the laws of the State, and by ordinances of the City, or within one mile thereof. *Ch. L. & Ord.* (1893) *sec.* 137, p. 88.

The authority of the Council is thus defined in the City Charter:—"The Council shall have power to enact ordinances to preserve the health of the City and to prevent the introduction of infectious or contagious diseases, for which purpose its jurisdiction shall extend to any distance within one mile of the limits of the City." *Ch. L. & Ord.* (1893) *sec.* 31, p. 46.

The Board of Health has no legislative powers.

The Court is not concerned in this case with any part of the Charter and Ordinances of the City, except Section 137, under authority of which the defendants as a Board proceeded.

The record of their proceedings, their communications to this complainant, the hearings they accorded it in the Summer of 1895, their notice to the complainant that the Board had adjudged its works a nuisance detrimental to the public health, and the answer they have filed and the affidavits they have produced in this cause, all point conclusively

to the fact that it was proceeding under its Charter right,s and constitute notice to the complainant of the case it had to meet.

The proceedings under Sec. 137 of the Charter are as follows: Upon complainant that a nuisance exists within the City, or within one mile of the boundaries thereof, which may prove injurious to the health of the inhabitants thereof, the Board of Health have the right to hear and determine such complaint, &c., and upon adjudging the place or thing complained of to be a nuisance, whereby the health of the inhabitants of the City is or may be injured, may give directions to the responsible persons to abate the same. Upon the failure, neglect, omission or refusal of such responsible person to comply with the directions of said Board of Health, the Board may itself abate and collect the expenses from such person, or such person may be prosecuted criminally in the Municipal Court, fined and imprisoned; and from the judgment of said Court in such cases there is no appeal. *Ch. L. & Ord. sec.* 137, *pp.* 88, 89.

The mode of procedure thus laid down for the Board of Health, to hear and determine complaints and adjudge concerning the character of the matter or thing complained of, is *ex parte*, without notice to the party charged, without opportunity for such accused party to be heard by himself or his attorney, or to defend the charge by calling witnesses upon the facts to be determined. The hearing and determination of the Board is therefore neither a judicial nor *quasi* judicial one, does not bind the accused party or conclude any of his rights. *Del. Const. Art.* 1, *secs.* 7, 9; *Cooley Const. Lim.* (4 *Ed.*) 438, 504, & *note* 2; *Hutton vs. City of Camden*, 39 *N. J. L.* 122, 23 *Am. Rep.* 203; *State vs. Trenton*, 36 *N. J. L.* 283; *Turnpike Co. vs. Hall*, 17 *N. J. L.* 337; *Belcher vs. Farrar*, 90 *Mass.* 327; *Commonwealth vs. Cambridge*, 4 *Mass.* 627; *Metropolitan Board of Health vs. Heister*, 37 *N. Y.* 681; *Weil vs. Ricord*, 24 *N. J. Eq.* 169, 176.

The decision of the Board of Health, upon the question of nuisance or no nuisance is like the finding of a Grand

Jury; that is to say, it constitutes a charge against a person, which, in the proper tribunal, may be judicially investigated at the option of the accused party. If the accused party acquiesces, and obeys the directions of the Board of Health, to abate the matter or thing complained of, no issue is raised. If, on the contrary, the accused party does not accept the determination of the Board of Health, he may have his day in Court, and a full hearing *de novo*. One method of so securing a hearing upon the merits is by an injunction bill in chancery, staying the action of the Board of Health. *Hartmann vs. Wilmington*, 1 *Marvel* 215; 1 *Beach Inj. sec.* 29.

This Board is attempting here to exercise what is called the "police power," which has been asserted by the Supreme Court of the United States to be incapable of any exact definition or limitation, and it is easier to determine whether particular cases come within the general scope of the power than to give an abstract definition of the power itself, which will be in all respects accurate. *Slaughter House Case*, 16 *Wall.* 62; *Stone vs. Mississippi* 101 *U. S.* 818.

The question whether a nuisance exists, cannot be settled conclusively, except in the regular course of law, before the established courts of law or equity. *Wood Nus. sec.* 740; *Hutton vs. Camden*, 39 *N. J. L.* 122; *Rogers vs. Barker*, 31 *Barb.* 447; *Tiedeman, Lim. Pol. Pow.* 427; *Yates vs. Milwaukee*, 10 *Wall.* 505; *Miller vs. Horton*, 152 *Mass.* 540.

There is a clear distinction between acts producing merely personal discomfort and those producing material injury to property. The latter constitute nuisances, the former must be submitted to. *St. Helen's Smelting Co. vs. Tipping*, 11 *H. L. Cas.* 642; *Hennessy vs. Carmony*, 50 *N. J. Eq.* 616; *Wood, Nus. Sec.* 532; 2 *Beach Inj.* 1094, 1099; *Commonwealth vs. Miller*, 139 *Pa. St.* 77, 21 *Atl.* 138.

In the present case, a nuisance generally, even from noisome smells, cannot be the basis of action by the Board of Health. The nuisance must be such, and be proved to be such, that thereby "the health of the inhabitants of said City is or may be injured." *Ch. L. & Ord. Sec.* 137, p. 88.

A preliminary or interlocutory injunction will be granted upon less positive proof than would be required at the final hearing to obtain a perpetual injunction. *United States vs. Duluth*, 1 *Dill.* 469; *High, Inj. secs.* 4 & 5.

In case of doubt an injunction should be continued if already granted, or by parity of reasoning, granted upon application. *Purnell vs. Daniel*, 8 *Ired. Eq.* 9. Especially is this true in this State where injunction bonds are required and any expenses incurred by the defendants are thereby assured to them. *Kersey vs. Rash*, 3 *Del. Ch.* 321, 326.

In such cases of doubt, consideration should be given to the comparative inconvenience of granting or refusing an injunction. 1 *Beach Inj. Sec.* 25; *Jessup & Moore Co. vs. Ford*, 6 *Del. Ch.* 52.

It lies wholly within the discretion of the Court whether to grant or refuse a preliminary injunction. *Purnell vs. Daniel, supra; Frunstone vs. DeCamp*, 17 *N. J. Eq.* 309, 316; *Irish vs. Black*, 17 *N. J. Eq.* 189, 200; *Fleischman vs. Young*, 1 *Stockt.* 620; *Kersey vs. Rash*, 3 *Del. Ch.* 321, 326.

It is particularly desirable that an interlocutory injunction should be awarded until by compulsory process the complainant shall have opportunity of fully presenting the evidence in the case; voluntary affidavits being difficult to procure.

An injunction should be awarded in this case, as upon the undisputed facts, little or no harm would be done to the defendants, and irreparable injury to the complainant may be prevented. In such cases the Court will grant or continue a preliminary injunction. *McBrayer vs. Hardin*, 7 *Ired.* 1. Particularly is this done when the affidavits produced at the hearing of the application for a preliminary injunction are conflicting. 1 *Beach, Inj. sec.* 157; *Connelly Mfg. Co. vs. Wattles*, 49 *N. J. Eq.* 92, 23 *Atl.* 123.

In determining whether any business constitutes or produces a public nuisance, the Court may take into consideration the magnitude and importance of the enterprise as

measured by the capital invested in it, the labor it employs, &c., and weigh the public annoyance as against public benefit.   2 *Beach, Inj.* 1106, *note* 1; *Commonwealth vs. Miller*, 139 *Pa. St.* 77, 21 *Atl.* 138.

*Robert G. Harman* and *H. G. Knowles*, for the respondent.

Equity will not interfere with, or control the judgment or discretion of municipal bodies upon matters properly intrusted to them, while they act in good faith, within the scope of their authority.   2 *High, Inj. secs.* 1240·1247, 1186, and cases cited; *Keogh vs. Wilmington,* 4 *Del. Ch.* 491; *McKinley vs. Freeholders*, 29 *N. J. Eq.* 164; *Harlan and Hollingsworth Co. vs. Paschall*, 5 *Del. Ch.* 435, 458; *Coe vs. Schultz*, 47 *Barb.* 64; *Upjohn vs. Board of Health of Richland*, 46 *Mich.* 542; *Salem vs. Eastern R. R. Co.*, 98 *Mass.* 431; *Hart vs. Mayor of Albany*, 3 *Paige*, 213, 18, *affirmed*, 9 *Wend.* 571.

When property is destroyed under the police power it is due process of law and no compensation is necessary.   *Coe vs. Schultz.* 47 *Barb.* 64.   And no jury trial can be demanded since it is not the proceeding appropriate to such cases. *Hart vs. Mayor &c. of Albany*, 9 *Wend.* 571, 590.   The fact that modern appliances are used and the offensiveness is reduced to a minimum is immaterial.   2 *Beach, Inj. sec.* 1051.

It was within the power of the Board of Health to abate the nuisance.   *Ib. Sec.* 1028; and they may do it by tearing down the building causing the nuisance, and such action is not taking property without compensation.   *Id. Sec.* 1022, and cases cited.

Adverse user is no bar to relief and the previous existence of a nuisance is no excuse for additions and repairs which perpetuate it.   *Id. sec.* 771; *Rochester vs. Erickson*, 46 *Barb.* 92.

THE CHANCELLOR:—

The complainants, the Liebig Manufacturing Company, are now, and for some months past have been, engaged in the business of manufacturing fertilizers within one mile of

the City of Wilmington, in the property formerly occupied and used by the Walton & Whann Company, for the manufacture of fertilizers.

On the 23d day of January, 1896, the Liebig Company was served with the following notice;

WILMINGTON, DEL., JANUARY 22nd.

Liebig Manufacturing Co., City.

GENTLEMEN:—

At a meeting of the Board of Health held last evening I was directed to notify you that the odors or gases emanating from your works on the Christiana River near the City line were declared a nuisance detrimental to the public health and you are directed to abate the same within five (5) days.

Yours Very Respectfully,

W. C. R. COLQUHOUN,

*Secretary.*

This notice was based upon an adjudication of the Board of Health, contained in the following resolution, adopted January 22, 1896.

Whereas, Action has been taken by this Board on several occasions against the Liebig Manufacturing Co., declaring their works near the City a nuisance, detrimental to public health; and,

Whereas, The said company has made promises to this Board of their speedy abatement, which promises have not been complied with; and,

Whereas, Complaints continue to come to this department, of men and children having been made sick from the gases or odors coming from said works; therefore, be it

Resolved, That this Board reiterates its former actions and declares the said works to be a nuisance detrimental to public health and the Secretary is hereby instructed to notify said company to abate the said nuisance in five (5) days.

After receiving this notification, and before the expiration of the five days therein limited, the Liebig manufacturing Company filed a bill in equity to restrain the Board of Health from taking any action or proceedings against them.

Upon the presentation of the complainant's bill I granted a rule to show cause why the preliminary injunction prayed for in said bill should not be awarded, with a restraining order until the determination of the rule. The bill prayed as follows:

"That a writ of injunction may issue out of this Honorable Court restraining the said defendants, and each of them, from taking any further steps or proceedings, whereby the operations now carried on at the factory of your orator may be hindered, delayed or stopped;

"That the said defendants, and each of them, may be perpetually restrained by the injunction of this Honorable Court, from taking any further proceedings against your orator, or in any wise interfering with its property, situate as aforesaid, so long as it is operated as at present and heretofore; and that a preliminary injunction may issue, to restrain the said defendants, and each of them, in like manner until the further order of the Chancellor;

"That the said defendants, and each of them, may be perpetually restrained, by the injunction of this Honorable Court, from taking any further proceedings against your orator, or in any wise interfering with its property, situate as aforesaid, whereby the use your orator makes, or has heretofore made, of its said property, will be injured or destroyed, or whereby your orator will be hindered or embarrassed in such use, and that a preliminary injunction may issue to restrain the said defendants, and each of them, in like manner until the further order of the Chancellor;

"That your orator may have such further and other relief as the nature of the case may require."

The defendants have filed their answer fully meeting and denying all the equities of the bill. A great number of affidavits have been presented and read on both sides, and the questions involved argued with conspicuous earnestness and ability.

Section 136 of the Charter of the City of Wilmington provides for the appointment of a Board of Health for the City of Wilmington, which Board shall consist of the port physician, two other physicians, one practical plumber and one general business man, the chief engineer of the Surveying Department of the said City, being ex-officio a member of said Board.

### Section 137 of the Charter is as follows:

"The said board shall be invested with all the powers and authority which the Council might or could exercise relative to the object of their institution, and with all powers and authority conferred and duties enjoined upon members of Boards of Health by the laws of the State, and by ordinances of said city, for the preservation of the public health within said City, or within one mile thereof. And the said Board of Health, upon complaint that a nuisance has been created, erected or continued, and is continued, within said city, or within one mile of the boundaries thereof, which may prove injurious to the health of the inhabitants thereof, shall hear and determine such complaint and, if necessary, view and examine the matter or thing complained of; and if the said board shall adjudge the place or thing complained of to be a nuisance whereby the health of the inhabitants of said city is or may be injured, the said board shall give directions to cleanse, femove, abate or remedy the same to the person or persons causing or producing such nuisance, or to the owner or owners, agents, tenants or occupier of the premises whereon the said nuisance exists; * * * * and if the person or persons, owners or owners agents, tenants or occupants, to whom such direction is given, shall not observe and fulfil the same, within the time therein prescribed, by the said board, the said board shall have power to order the said directions to be carried into effect, by some officer of the board, or other person, to whom the service may be committed, and the expenses thereof shall be paid by the person to whom the direction was originally given; but if the same shall not be paid by said person on demand, the same shall be paid by the treasurer of the board, who shall have the right to recover the same with interest and costs from the person who ought to have paid the same as aforesaid, as debts of like amount are recoverable.

"Any owner or owners, agent, tenant or occupant of the premises, who shall fail, neglect, omit or refuse to comply with the directions of said board, as aforesaid, shall, in addition to the penalties above mentioned, forfeit and pay a fine of not less than one dollar nor more than twenty dollars for every such offense, to be recovered in the Municipal Court of said city in the name of The Mayor and Council of Wilmington and in default of the payment thereof thall be committed to jail until said fine and costs are paid or otherwise discharged by law. From the judgment of said court in such cases there shall be no appeal." *Charter, Laws & Ord. (Ed.* 1893), pp. 88, 89.

Section 2 of Chapter 8, of the Ordinances of the City of Wilmington, (*Charter, L. Ord. Ed.* 1893, 384–5), has been cited and referred to by counsel, but the above is all the legislation on the subject bearing directly upon the question before this Court.

It is admitted that the defendants—the Board of Health of the City of Wilmington—have been regularly appointed and organized, in accordance with the provisions of the above recited section 136 of the Charter, and in the action taken by them, in relation to the factory of the complainant, they have manifestly intended to proceed in accordance with the provisions of section 137 above cited.

The authority of the Legislature to confer powers of this character, for the protection of the public health and the suppression of nuisances, upon municipal bodies or officers, is well settled, and has long been exercised in every State of the Union. Such powers must be summarily exercised in order to accomplish their object. To allow an alleged nuisance to remain until it had been decided by a Court, after deliberate trial, to be a nuisance, would defeat the purpose of such statutes. In such cases private rights must be held subordinate to the public welfare under the strictest interpretation of the maxim, "*salus populi suprema lex.*"

It is a settled principle of the common law, growing out of the nature of well ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it must be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious. The prohibition of noxious uses of property is very different from the exercise of the right of eminent domain,—the right of the State to take and appropriate private property to public use, whenever the public exigency requires it,—which can be done only on condition of providing a reasonable compensation therefor. The former is the exercise of the police power, of which Chief Justice Shaw says: "It is much easier to perceive and realize the existence and sources of this power than to mark its boundaries or prescribe limits to its exercise." *Commonwealth v. Alger*, 7 *Cushing* 85.

Again Justice Miller in the famous *Slaughter House Cases*, 16 *Wallace*, 86, after quoting Chief Justice Shaw, remarks: "This power is and must be from its very nature incapable of any very exact definition or limitation."

Illustrating this application Chief Justice Shaw says in the cases cited above: "If a landlord could let his building for a smallpox hospital or a slaughter house, he might obtain an increased rent. But he is restrained; not because the public have occasion to make the like use, or to make any use of the property, or to take any benefit or profit to themselves from it, but because it would be a noxious use contrary to the maxim, *sic utere tuo ut non alienum laedas*. It is not appropriation of the property to a public use, but the restraint of an injurious use by the owner, and is therefore not within the principle of property taken under the right of eminent domain."

When such noxious use of property is injurious to the rights of the community, causing a public annoyance of a sensible, tangible sort, it is called a public or common nuisance, and is a criminal offense. The person or persons, responsible for its existence, are liable to indictment and the nuisance itself might at common law be summarily abated by private individuals, under certain conditions and limitations, even if the abatement should involve the destruction of valuable private property. Or again, a bill in equity might be filed in the name of the Attorney General to enjoin the noxious use complained of.

Although all this is "Horn-book law," and generally admitted as soon as stated, so that it would be superfluous to cite authorities, yet a confusion of ideas in regard to it,—a practical ignoring of its meaning and its consequences,—appears in so many adjudicated cases, that a restatement, in the precise language of some of our greatest jurists, of these fundamental common law principles seems a desirable, if not necessary, introduction to the consideration of the grounds upon which a Court of Equity will interfere, by injunction, to restrain the exercise of the police power, a clear understanding of which is necessary to the determination of this cause.

Innumerable cases have arisen in our State and Federal Courts, where the Courts have been obliged to pass upon the Constitutional limitations of the police power; and definitions and discriminations without number are to be found in cases arising under statutes, in which State Legislatures have prescribed what shall constitute a public nuisance, and have sought to bring acts and occupations within the reach of the police power by calling them public nuisances, which were not so considered at common law.

But such questions are in no wise involved in the present case. The Legislature has not sought to extend the boundaries of its police power, or to make any new definitions of a public nuisance; it has simply delegated to the Board of Health of the City of Wilmington a summary jurisdiction over that class of common law nuisances which are, or may be, detrimental to the public health.

There are many American cases in which the Courts have been called upon to pass on the question of the conclusiveness of the summary adjudications of municipal bodies in relation to nuisances,—whether under such statutes as this, they were the sole and exclusive judges of the existence of facts, upon which the exercise of the power of summary abatement depended.

A number of them have been cited by counsel on other points. In such cases, either the municipal body has been a defendant in an action for damages, where valuable property has been injured or destroyed, in pursuance of an adjudication, by the municipal authorities, that it constituted a nuisance, or the municipal body or officer has appeared as a plaintiff, suing for the expenses incurred in abating what had been adjudicated to be a nuisance, or for a penalty.

These are cited and commented upon in the standard text books on the subject of nuisances and most of them are collected and conveniently grouped in a carefully prepared article upon The Summary Condemnation of Nuisances, in 30 *Am. L. Reg.* 157 *et seq.* In general they are to the effect that the judgment of the municipal body is not final, and that, in an action for damages, they might be required to

justify their action; or in an action brought by them for a
penalty or for expenses incurred, they must establish their
case, by proving that they had acted within their jurisdic-
tion, and that the property or occupation adjudged to be a.
nuisance, was such in fact.   These decisions are of course
based upon statutes which vary not a little in the different
States, and they abound (particularly the Massachusetts
cases) in discussions of the principles governing such delega-
tion of the police power and in discriminations and classifica-
tions that are extremely interesting.   But a review and analy-
sis of them by the Court in this case would be superfluous..
It is expressly admitted by counsel on both sides, that an
adjudication of the Board of Health of the City of Wilmington
is not conclusive, and that, if the Board of Health should
enter upon and interfere in any way with the complainant's.
plant, the Liebig Company might test the lawfulness of its.
action, by bringing a suit for damages in the Superior Court,.
where the facts at issue would be decided by a jury under the
direction of the Court.   And this is emphatically stated to be
the law, in the opinion of the Superior Court of this State, in
the case of Hartman v. Mayor and Council of Wilmington, 1
*Marvel*, 215.

It must be considered then as settled, that although the
Board of Health possesses the power to summarily abate nui-
sances, which are, or may be, detrimental to the public health
of the City of Wilmington, and, if the abatement should in-
volve the deprivation or destruction of property, the owner
would be deprived of his property by due process of law
within the meaning of the Constitution; yet the adjudica-
tion by the Board of the fact of nuisance would not protect it
as would the judgment of the Court, and in all cases it would
act at its peril.

Upon the question of judicial interference, by injunction,
to restrain the abatement of what the landowner or occupant
denies to be a nuisance, the cases are comparatively few, and
most of them deal with obstructions to streets, highways and
waterways.

The general principles governing Courts of Equity, in the exercise of this great power, are too well known to require statement or comment, but their application to the class of cases, to which the cause before the Court belongs, does require most careful consideration.

A patient examination of the whole course of decisions, on the general subject of the police power, and the summary abatement of nuisances, has left me in no doubt that a Court of Equity upon an application for an injunction to restrain a Board of Health or other municipal body from the summary abatement of what it has adjudged to be a public nuisance detrimental to the public health, will decline to restrain the proposed action of the local body, unless it is made to appear clearly, that it has acted wantonly and in bad faith, or has exceeded its jurisdiction. And the Court upon such application will not ignore the adjudication of the Board of Health and try the issues of fact, involved in the final determination of the question whether a nuisance actually exists in any given case, in the same manner that it would upon bill or information filed by the proper authority to enjoin an alleged public nuisance.

If a local Board clothed with the delegated police power of the State, for the protection and preservation of the lives and health of the inhabitants, within its jurisdiction, were restrained from acting, by the strong arm of a Court of Equity, whenever a doubt could be raised as to the correctness of its decisions upon matters of fact, and an alleged nuisance allowed to continue, unabated, until a full trial could be had before the Chancellor, the whole object for which such extraordinary powers are conceded or delegated, would be defeated.

The doctrine I have stated is necessarily implied in that of the summary abatement of nuisances, and, as is apt to be the case with obvious and fundamental principles, it is generally followed by the Courts without being expressly formulated. I will only cite here *Belcher v. Farrar*, 8 *Allen* 330, in which, Chief Justice Bigelow, in construing a Massachusetts statute providing for summary abatement of nuisances, ex-

presses the controlling principle of public policy with force and emphasis.

There is no precedent in this State for an application of this kind, and but few are reported in other States. For that reason I will cite at length the few cases which resemble the one before the Court, especially the three from New York and New Jersey, which involve all the points arising in the case before the Court.

The leading case in New York, widely cited and followed, is that of *Coe v. Schultz*, 47 *Barb.* 65, decided in 1866. This was heard on a motion to continue an injunction, and the opinion of Sutherland, J., is as follows:

"The defendants, constituting the Metropolitan Board of Health, made an order that the manufacturing of super-phosphate of lime, or poudrette, by the plaintiff, at Hunters Point, within the metropolitan sanitary district, created by the act of February 26, 1886, be forthwith discontinued until the mode of conducting said manufacture should be so altered as that no odor or fumes could escape into the external air; further ordered that such order be executed by the Metropolitan Board of Police; and a temporary injunction was granted restraining the execution of said order. The plaintiff, in his complaint, insists that the business or manufacturing process, as carried on by him, was in no respect a nuisance. The defendants in their answer, insist that said business, or manufacturing process, was a public nuisance, and not only disagreeable, but injurious to life and health. On the hearing of a motion before me to continue the injunction, many affidavits were read on the part of the defendants, tending to show that the said business, or process of manufacturing, was and had been for some time a public nuisance; and not only disagreeable and annoying to many persons residing in the neighborhood, and to persons passing and repassing, but also injurious to public health; and many affidavits, on the part of the plaintiff, tending to show that the said business, or process of manufacturing, was not, had not been, and could not be, injurious to life or health. After

hearing these affidavits, I at once said that, considering them, and the presumptions in favor of the defendant as public officers, having a great public duty to perform, I should not feel justified in continuing the injunction on the ground that the thing or act ordered to be discontinued or altered, as a public nuisance, was not or could not be a public nuisance.''

He also says: ''I am not willing to concede that the legislature can constitutionally declare an act or thing to be a common nuisance, which palpably, according to our present experience, or information, is not and cannot be, under any circumstances, a common nuisance, by the common law definition, or common law decisions. I am not willing to concede that the legislature can constitutionally declare or authorize ány sanitary commission or board to declare the keeping or the use, in any way, of sugar or vinegar to be a common nuisance, because the one is sweet and the other sour, or for any other reason. By such an unlimited power it is easy to see that any citizen might be deprived of his property without compensation, and without any colorable pretext that the public good required such deprivation. It is not impossible to conceive that at some future day there might be a legislature thinking the use of water in any way to be a nuisance. But my construction of the metropolitan sanitary act is, that it does not authorize, and was not intended to authorize, the board, or any part or member of it, to redefine a nuisance or common nuisance, or to declare an act or thing to be a common nuisance which, clearly, under any circumstances, is not or cannot be such at common law. Notwithstanding the evidently labored effort, by section 14 and other parts of the act, to give the board full and complete power to remove, abate, suspend, alter, improve and purify any thing dangerous to life or health, as a public nuisance, yet my construction of the act is, that the question whether the thing which has been or is to be removed, abated, &c., was or is dangerous to life or health, or was or is a public nuisance, is a jurisdictional question, but of course independent of the special provision in the act to this effect; considering that the act not only gives

power, but imposes a great public duty, on such a question, all presumptions are and should be in favor of the board. This appears to have been Justice Ingraham's construction of the act in *The Mayor, &c., of New York v. The Board of Health.*"

In *Babcock v. City of Buffalo*, 56 *N. Y.* 268, eight years later, the decision was upon restraining the particular manner in which the municipal body chose to abate the alleged nuisance—a slip in the canal—and the Appellate Court held, that an injunction restraining them from filling the slip had been wrongfully refused, because it had been established by the findings of the Special Term that the nuisance might have been easily abated and at small cost by cleaning out the slip and removing the obstructions instead of by filling it up.

In *Ferguson v. City of Selma*, 43 *Ala.* 399, in 1869, the application was for an injunction against the City of Selma to prevent the abatement of an alleged nuisance, that is, the destruction of two filthy tenement houses. The action of the Chancellor in refusing the injunction was sustained on appeal, the Court saying:

"It is, no doubt, a very serious and important duty of the corporate authorities of a city, in the latitude of Selma to guard the health and comfort of its people, and we would interfere with great hesitancy with the prudent discharge of this necessary duty. The present case does not show, either upon the pleadings or the proofs, such a case as would justify such an interference. The action of the chancellor in the court below is, therefore, approved."

In *Mayor, etc. of Americus v. Mitchell*, 79 *Ga.* 807, 5 *S. E.* 201, (1887), an injunction had been granted restraining the municipality from destroying a mill-pond which it had adjudged to be a nuisance, and this had been done after the dam had been swept away by a rain. The Supreme Court held that the Chancellor had erred, for this reason, in granting the injunction, and also said (p. 809):

"Whenever the city authorities proceed in the summary manner authorized by their charter, they do so at their peril. The owner of the pond in this case would not have been remediless at law. He would have had a right, in a suit at law, to establish, if he could, that the pond was not a nuisance; and if he could show that to the satisfaction of the jury, he would be entitled to such damages as he sustained by the summary action of the city authorities. It would be a great wrong, upon people living in crowded cities, to hold that, in every case of nuisance, affecting perhaps the lives of hundreds or thousands of the inhabitants, the city authorities would have to go through a long and tedious trial, before a court and jury, before they could abate or abolish the nuisance. But, as said before, when they do act, they must be certain that they are right, and that the thing abated is a nuisance, or they will subject the municipality to damages."

In the often cited case of *Kennedy v. Phelps*, 10 *La. Ann.* 227 (1855), it was held by the Court, that the proceedings, contemplated by the municipal officer, against the alleged nuisance—a tannery—was a prosecution before the local Court for a fine, and not its summary abatement; and it was not even suggested that the Court could restrain a prosecution for a penalty.

The cases which most nearly resemble the one before the Court are the two New Jersey cases. In the first one, *Manhattan Manufacturing and Fertilizing Company v. Van Keuren*, 23 *N. J. Eq.* 251 (1872), the complainants were engaged in manufacturing a fertilizer in Jersey City, near Communipaw Bay and had commenced business in October, 1870, and continued it until July, 1872, when the defendant, a street commissioner, gave notice to the complainants that, upon complaints made to him, he had entered their premises and ascertained there the existence of a nuisance, such nuisance consisting of putrid and decaying animal matter and unwholesome smells, and requested complainants to abate the same within twenty-four hours.

The notice being disregarded by the complainants, the defendant with twenty-five policemen, and others, entered the factory and proceeded to abate the alleged nuisance by taking off the eccentric rods of the machinery, removing the belting or gearing, damaging and carrying off parts of the machinery and property and committing other acts to put a stop to the complainant's works. The opinion of the Vice Chancellor proceeds as follows (p. 252):

"On the 24th day of July, the complainants exhibited their bill of complaint, and an injunction was ordered by the Chancellor to a part of the extent prayed for in the bill. It restrained the defendant from destroying, breaking, or injuring any of the machinery or gearing, from burning complainants' factory, and from burning or destroying any of their property. In addition to this, the bill asks that the defendant be further restrained from resorting to any forcible proceedings to hinder or impede the operation of complainants' works, till they be lawfully adjudged to be a nuisance.

"The order granting the injunction to the extent above stated, directed the defendant to show cause before the Vice Chancellor why an injunction should not issue pursuant to the prayer of the bill.

"The rule to show cause has been argued upon bill, answer, and affidavits, and was claimed by defendant's counsel to present for discussion and decision the question whether the existing injunction should not be removed, as well as the question whether the additional injunction referred to in the rule should not be allowed. This claim is not warranted, I think, by the language or the spirit of the rule. The existing injunction can be removed only upon notice and motion to dissolve. Without such notice and motion, I shall not assume to consider the propriety of its continuance. It prohibits forcible proceedings by the defendant to a certain extent and of a certain specific kind. It may properly be regarded as depending on principles and reasons not applicable to the injunction referred to in the rule to prohibit all forcible proceedings whatever. The proper exercise of powers

within the limits of a reasonable discretion, is one thing; the abuse or perversion of them, is another. The latter may be restrained, while the former will not. Whether or not there has been such abuse, I do not mean to decide or to intimate but simply to point out the plain and important distinction. It may be lawful to purge premises of a nuisance, and unlawful to burn or destroy them. How much force, or what kind, may be permissible in abating it, is obviously a different inquiry from the permissibility of any."

The Vice-Chancellor then proceeded to consider the claim of the complainants, that the question, whether their business or works constituted a nuisance, or not, should be determined by a legal tribunal in a trial, where they could be heard, and that the said commissioner could not himself adjudge their works to be a nuisance, and proceed to abate them, without a violation of their lawful and constitutional rights, which a Court of Equity would restrain. This claim he disposed of in the following language (p. 255):

"At common law, it was always the right of a citizen without official authority, to abate a public nuisance, and without waiting to have it adjudged such by a legal tribunal. His right to do so depended upon the fact of its being a nuisance. If he assumed to act upon his own adjudication that it was, and such adjudication was afterwards shown to be wrong, he was liable, as a wrong doer, for his error and appropriate damages could be recovered against him. This common law right still exists in full force. Any citizen, acting either as an individual, or as a public official, under the orders of local or municipal authorities, whether such orders be or be not in pursuance of special legislation or chartered provisions, may abate what the common law deemed a public nuisance. In abating it, property may be destroyed and the owner deprived of it, without trial, without notice, and without compensation. Such destruction for the public safety or health, is not a taking of private property for public use, without compensation or due process of law, in the sense of the Constitution. It is simply the prevention of its noxious

and unlawful use, and depends upon the principles that every man must so use his property as not to injure his neighbor, and that the safety of the public is the paramount law. These principles are legal maxims or axioms essential to the existence of regulated society. Written constitutions pre-suppose them, are subordinate to them, and cannot set them aside. They underlie and justify what is termed the police power of the state. By virtue of that power, numerous and onerous restrictions and burdens are imposed upon persons and property which, for other purposes or on other grounds, would be prohibited by the constitutional limitations sought to be applied in this suit. *Cooley on Const. Lim.* 572; *Potter's Dwarris on Statutes* 444." After citing *Coe v. Schultz*, 47 *Barb* 65, and quotations from Judge Sutherland's opinion in that case he concludes as follows:

"In the present case the complainants deny that their business or works are a nuisance. The defendant avers that they are. and affidavits are offered on both sides in support of these assertions. In the view I take of the case, the defendant acts at his peril. His own adjudication of the fact of a nuisance will not protect him, as would the judgment of a court. It was said at the argument that actions had been commenced against him for the recovery of damages, and are now pending. It is unnecessary for me now, and, in my judgment, would be improper to express an· opinion upon the question to be determined in such actions. It is sufficient to say that the affidavits to show the offensive and noxious odors emitted, and pervading; at times, the vicinity of the works, are numerous and explicit. They are sufficient to prove that the commissioner's conclusion as to character of complainants' business and works, was not entirely without evidence to support it. The correctness of the conclusion is not now to be determined.

For the reasons. that no violations of the complainants' constitutional rights are shown to be threatened, such as the court may, in some instances, interpose to prevent, and that the complainants' damages, if any shall be sustained, are not

shown to be irreparable at law, I am of opinion that the application for the injunction must be denied. Costs to abide the event of the suit."

The last New Jersey case, *Weil et al. v. Ricord*, 24 N. J. Eq. 169 (1873), seemed to be largely relied upon by counsel for complainant. This was decided by Chancellor Runyon on a motion for an injunction to restrain the defendants, who constituted the Board of Health of the City of Newark, from prohibiting the complainant from carrying on, on his premises in that city, his business of hide-curing. Complainant's business had been decided to be a nuisance by the Board of Health, and two notices had been served on him without his having a hearing, although he had applied for one, the last notice being to the effect that his place must be shut up, and that after a certain date he would not be permitted to receive any stock, hides or fat on his premises.

On the argument of the motion, counsel for the defendants admitted that the business might be so conducted as not to be a nuisance and that under their notice the Board intended, unless restrained by the Court, to prohibit the complainant from further using his premises for his business.

The Chancellor uses first the following language in reference to the authority and functions of Boards of Health:

"Among the objects sought to be secured by municipal government, there is none more important than the preservation of the public health, and, therefore, the imperative obligation rests on the government of every city, promptly, to abate or remove all nuisances by which the public health may be affected. It is no less its duty to provide in like manner for the comfort and convenience of the inhabitants within ts limits. To these ends, such governments are clothed with police powers. These being among the powers which are of the most importance to the inhabitants, those by which the public peace, health, comfort, and convenience, and the general welfare are secured or promoted, are not only respected

but maintained by the courts, who, as a matter of public policy, will not interfere with or disturb municipal bodies in the legitimate exercise of those powers.   It is only when those bodies transcend their limits in that respect, that the aid of the courts can be successfully invoked to restrain them, or to visit upon them the injurious consequences of their acts.   The necessities of the community ofttimes require the promptest and most positive action.    There are times when public health is the object of paramount concern, and the law wisely lodges in municipal bodies, the discretion and power adequate to such emergencies, a power and discretion whose existence is, at all times, necessary to secure  the public, health, comfort, and convenience."

He then decides as follows (p. 174):

"The question, in this case, is not as to whether the Court would interfere with the action of the board in abating a nuisance, but whether the board, in the legitimate exercise of its powers and discretion, may absolutely prohibit a lawful business, not necessarily a nuisance, but which on the other hand, may be carried on, in the midst of a dense population, without injury or danger to the public health, and without public inconvenience. * * *

"The board of health may proceed, without notice,in case of public emergency, to abate a nuisance; but their adjudication going beyond this, to the extent of depriving a person of the use of his premises for the future, in his lawful business, would, if otherwise lawful, be invalid, if an opportunity had not been afforded to him to be heard before the making of the adjudication.   *Belcher v. Farrar*, 8 *Allen* 325; *City of Salem v. Eastern R. R. Co.*, 98 *Mass.* 431. * * * *

"The defendants will be  enjoined from preventing the complainant from prosecuting his business on his premises, so long as it shall be so conducted as not to be a public nuisance.   If, however, he shall so conduct it as to create a public nuisance, he must, and ought to suffer the interruption which will be occasioned by the abatement of the nuisance.

"In the interdict which I authorize, I do not propose to derogate, in any degree, from the lawful power or discretion of the board.  I intend only to protect the complainant in his right to conduct, on his premises, a lawful business, not *per se* a nuisance, in such a manner as not to be a just cause of public complaint.  In other words, the defendants must be confined, in their interference with the complainants' business, to such interruptions as may be reasonably necessary to enable them to abate any nuisance he may create in conducting it."

All these decisions, from which I have quoted so freely, are remarkably harmonious, and are obviously in complete accord with the principles which I have already laid down. The long quotations which I have made show this better than could any summary, and render analysis and comment unnecessary.

In the case before the Court, the complainant does not allege *mala fides* and does not raise any constitutional question, but bases its application for a preliminary injunction essentially upon the two grounds of irreparable mischief or inadequate remedy at law, and a denial of the fact of nuisance.  It is true, that it is alleged in the bill "That the Board of Health gave complainant no opportunity to be heard, at the time said Board heard and determined the complaints made, and did not at said time view the matter or thing complained of."  But it was not and could not be seriously contended by counsel, that an opportunity for such a hearing, was requisite to the regularity of the proceedings taken by the defendants, under the provisions of section 137 of the Charter already cited, and the necessity of a view of the thing or place complained of is plainly left to their discretion.

It is also admitted in the bill that complainant received communications from the Board of Health during the last nine months, in which the Board claimed that complainant was so conducting its business, as to violate the laws of the State of Delaware.  And it alleges "that it had met these charges, made by the said Board of Health, by insisting that

said Board was and is mistaken, and by inviting it to its said works, and endeavoring to prove to it its mistake in making this assertion,'' and that it had expended large sums of money in making alterations in its plant in endeavoring to satisfy the Board.

It is apparent therefore, without considering the allegations of the defendants, on this point, that the final adjudication of the Board was made after inspection of the complainant's plant, and after much consideration and deliberation.

But the complainant alleges, in its bill, that the defendants have mistakenly ascribed the emanation of vile odors and gases to its factory, instead of to other sources, in the neighborhood of its plant, from which they do emanate, and that its business is not detrimental to the public health and that the health of the inhabitants of the City of Wilmington, ''is not nor can it be injured, from any cause or causes, arising from the operation of said factory.''

To this allegation the defendants in their answer allege that ''the business as carried on by complainant is offensive and injurious to the comfort, convenience and health of the public,'' and that the offensive and deleterious odors and gases, complained of, do come from complainant's works and not elsewhere.

In support of this allegation, upon the hearing of the motion before me for the preliminary injunction, a great number of affidavits were read on the part of the defendants, in which affiants, residing in different parts of the City of Wilmington, —some at points remote from the complainant's works,—state, that at irregular intervals between the month of June, 1895 and the 22nd of January, 1896, odors which they describe as resembling garlic and gasoline, or onions and coal-oil, filled their houses with a stench which they characterize as sickening and intolerably offensive, compelling them, even in the summer time, to close their doors and windows, and that these odors emanated from complainant's works. A number of these affiants also state that these odors produced in the affiants nausea and vomiting, burning in the nose and throat

and pains in the head. Several affidavits of physicians were also read, expressing the opinion that these odors were detrimental to the public health.

On the other hand, a still greater number of affidavits were read on the part of the complainant, in which affiants, residing in all parts of the City of Wilmington, or having places of business in the neighborhood of the complainant's works, state that the said odors or gases did not affect their health in any way, and were not strong enough and were not perceptible often enough to constitute a public nuisance.

Several affidavits of physicians were also read, stating that no cases of sickness had occurred in their practice attributable to said odors and that, in their judgment, such odors were not detrimental to the public health.

In almost every instance, however, the distinctive character of the odors emanating from or traceable to the complainant's works was admitted, and the difference between the affidavits on the part of the defendants, and those on the part of the complainant in relation to the odors, was mainly in regard to the intensity, frequency and effect of such odors; many of the affiants, on the part of the complainant, specifying other odors prevalent in the said City which they considered to be much worse.

There were other affidavits, on the part of the defendants, in relation to the pollution of the Christiana River, by the refuse products of complainant's factory, tending to show that the business of the complainant, as heretofore conducted, constituted a nuisance, detrimental to the public health in other respects; and affidavits, on the part of the complainant, tending to show that the said river was not polluted by it and that its works did not constitute a nuisance.

There were also affidavits on the part of the defendants tending to show the regularity of all their proceedings.

The respectability and credibility of the affiants on both sides are unquestioned.

After hearing all these affidavits, and carefully considering and weighing them, I am satisfied that it does not appear from them that the odors or gases emanating from complain-

ant's works were not, or could not be, a nuisance, whereby the health of the inhabitants of the City of Wilmington was, or might be, injured, or that the defendants had exceeded their jurisdiction, in the adjudication and notice upon which complainant's application is based. Therefore this Court will not grant a preliminary injunction restraining the defendants from proceeding to abate the odors or gases which, in the notice already cited, they directed the complainant to abate, as a nuisance detrimental to the public health: and as the statute expressly limits the action of the Board of Health, in the abatement of any alleged nuisance, to the directions in the notice served by it, it must be assumed, in the absence of any evidence to the contrary, that such is the only action contemplated by the defendants.

The almost unlimited range of human ingenuity, in the present age of scientific discovery, seems to be equal to rendering almost any trade innocuous, in almost any locality, and the Courts recognize this fact in the modern rulings as to what trades or uses of property are nuisances *per se*, or even *prima facie* nuisances; and the Board of Health of the City of Wilmington have no authority to prevent any inhabitant from carrying on any lawful business, not necessarily a nuisance, in such manner as not to be a public nuisance.

Nor do the defendants claim that the complainant's business cannot be carried on, in its present plant, in such a manner as not to be a nuisance, detrimental to the public health, and their counsel upon the argument of this motion insisted that it was not the desire of the defendants to close complainant's works, or to cause them to remove their business from its present location.

Complainant alleges in its bill that if not restrained, the defendants will, "abate the emanation of odors and gases from its factory; and if said Board should be allowed to interfere in any way with the gases or other chemical reactions or effects, necessary, as they are, to the successful prosecution of the legitimate business, carried on by it at that place, it would result practically in the absolute destruction of its

plant, which would be useless for any other purpose, and a loss would be entailed, for which it could not be compensated in any suit for damages."

To this allegation the defendants reply in their answer that "if not restrained it would have taken such action as it, in its judgment, deemed best, acting always under the strict authority of the law, and keeping always within the strict limits of its authority; and that the complainant has full, ample and complete remedy at law, for any illegal or unwarranted action on the part of the defendants."

But this Court for the reasons already given will not grant a preliminary injunction which would restrain defendants from abating the emanation of odors or gases from complainant's factory, and it is not therefore necessary for the Court to pass upon the question, whether the complainant would, or would not, have an adequate legal remedy, if such action by the defendants should cause the practical destruction of its plant. Nor would it be proper for this Court to discuss here the questions that might arise, for the Courts of law to determine, in an action for damages, brought by the complainant, for the result of any interference with its plant by the defendants, and which might be held by those Courts to be unreasonable or unlawful.

In the absence of any evidence to the contrary, it cannot be assumed by this Court that the defendants will act otherwise than as defined by their notice and alleged in their answer.

Other points, which were ingeniously and ably urged by the learned counsel for the complainant, it is not necessary for me to consider, because they are dependent upon the points already decided.

I will deny the motion for a preliminary injunction and discharge the rule.

And it was so ordered.